Southland Industries, Inc. v. Commissioner.Southland Indus. v. CommissionerDocket No. 3387.United States Tax Court1946 Tax Ct. Memo LEXIS 44; 5 T.C.M. (CCH) 950; T.C.M. (RIA) 46262; October 31, 1946*44 The taxpayer corporation, engaged in operating a broadcasting station, in 1940 and prior years accumulated earnings which its sole shareholder loaned to an oil corporation in which he also held all shares and invested in other enterprises. The taxpayer's broadcasting equipment was in good condition, could have been modernized at moderate cost, and represented less than half its capital account. Held, on the evidence that in 1940 equipment for television, frequency modulation, facsimile reproduction and other improvements were not needs of its business, and that surplus was accumulated to prevent imposition of surtax on its shareholder within the meaning of section 102, Internal Revenue Code. Leroy G. Denman, Esq., for the petitioner. Homer J. Fisher, Esq., for the respondent. JOHNSON Memorandum Findings of Fact and Opinion JOHNSON, Judge: The Commissioner determined in petitioner's surtax of $21,731.37 for the fiscal year ended July 31, 1940, under section 102, Internal Revenue Code. Petitioner assails the determination that it accumulated earnings and profits beyond the reasonable needs of its business to prevent the imposition of surtax upon its shareholder within the meaning *45 of section 102. A second assignment of error involving an income tax deficiency of $1,353.51, based upon depreciation adjustments, was abandoned. Findings of Fact Petitioner, a Texas corporation with principal office at San Antonio, Texas, was organized in 1911 as the Fisk Company of Texas; its name was changed in 1919 to Southern Equipment Company, and in 1933 to Southland Industries, Inc. It engaged at first in the purchase and sale of merchandise, particularly tires and automotive accessories, and later radio and electrical equipment. In 1922 it installed a small radio transmitter and expanded its activities to include the operation of a broadcasting station. In 1930 it acquired a 50 kilowatt transmitter; later sold out its stocks of merchandise and since 1933 has devoted itself exclusively to the operation of a commercial broadcasting station known as WOAI. Petitioner began business with a capital of $25,000, represented by 100 shares of stock, of which G.A.C. Halff subscribed for and acquired 51 shares. Thereafter its capital was increased from time to time by contributions of cash and assets and by the declaration of stock dividends. In 1921 shares of a par value of $50,000 were *46 donated to the treasury and on January 30, 1934, shares of a par value of $26,923.07 were purchased by petitioner for $35,112.66 and inferentially retired. Since December, 1935, petitioner has had outstanding shares of an aggregate par value of $500,000, of which $180,576.93 represents contributions of cash and assets and $319,423.07 represents stock dividends. On or before February, 1934, G.A.C. Halff acquired all stock held by others, and has since been the sole shareholder. Petitioner derives its income from the sale of advertising to national and local customers, receiving cash payment for its service on a monthly basis. About a third of its business is with the National Broadcasting Co.; a tenth with the Texas Quality Network; four-tenths with national advertisers and the remainder with local advertisers. It competes with four smaller local stations (one of which is now erecting a 50 kilowatt transmitter) and with large stations elsewhere. It has the largest transmitter in San Antonio and the only one classified as A-1. In 1936, Halff accepted an offer of the Columbia Broadcasting Co. to purchase petitioner's station, but the Federal Communications Commission refused to approve *47 the sale, defeating its consummation. Petitioner serves an area extending from 75 to 200 miles west and northwest of San Antonio and a lesser distance to the north and east. A summary schedule of gross and net income, expenses and deductions, dividends paid, and total book value of stock and surplus of the petitioner, for its fiscal years 1934 to 1944, inclusive, is as follows: TotalIncome Ad-TotalFiscalGrossjusted aExpensesNet IncomeDividendsYearsReceipts(Incls.and Deduc-after Fed.Paid, OtherEnded(Broad-Int., Rent.tions. Ad-Inc. & Exc.Than inJuly 31casting)Divs.)justed aP. Taxes aStock1934$178,584.66$212,617.48$141,342.05$ 61,475.06None1935199,297.39236,223.62150,356.2473,968.63$ 62,500.001936231,207.57270,977.66167,735.5589,046.3257,307.691937277,103.09332,671.57171,070.00139,353.11125,000.001938319,350.92367,604.69194,470.89148,962.19150,000.001939376,782.16410,430.37229,686.94148,320.6275,000.001940408,378.12437,335.07239,752.30161,925.4675,000.001941487,418.31526,251.05268,387.50c 188,484.8150,000.001942577,155.68617,528.82298,703.18c 178,484.1350,000.001943 d601,780.93648,603.19312,270.57132,752.1950,000.001944 d754,970.01781,654.15361,190.76180,681.5375,000.00Total ofFiscalStockYearsand Sur-Endedplus PerJuly 31Books1934$521,820.041935533,381.621936563,863.581937562,745.481938575,294.561939645,847.221940b 726,938.401941857,733.951942984,865.731943 d1,079,364.901944 d1,200,914.12*48 As of July 31, 1940, petitioner's books showed the following assets and liabilities: ASSETSCash$118,550.82Notes and Accounts Receivable: Customers (Radio)$ 29,943.66Customers Merchandise Sales15,436.80Sundry Accounts (N.B.C. - $14,842.12)15,021.97Officers and Employees125.00Total60,527.43Less: Reserve for Bad Debts16,464.3344,063.10Loans Receivable: Blanco Oil Company377,200.00G.A.C. Halff13,356.26Others16,651.73407,207.99Accrued Interest Receivable: Blanco Oil Company103,188.31Others16,289.92119,478.23Stocks and Bonds: Stock of Ratcliffe-Payne Motor Co.22,100.00Bonds of Dittmar Properties41,000.00Central P. & L. Corp. 6% Pfd. Stock960.00Others1,810.00Street Widening Certificates3,654.0069,524.00(Fixed Assets): Land35,437.98Buildings91,915.31Other Real Estate1,200.00Machinery and Equipment, Broadcasters, Etc.215,892.43Furniture and Fixtures and New Studios59,124.50Respossessed Equipment1.00Total Land, Buildings and Equipment403,571.22Less: Reserve for Depreciation250,277.89Balance153,293.33Prepaid Insurance, Taxes, etc.1,353.46Total Assets$913,470.93LIABILITIESAccounts payable: Trade$ 4,272.60G.A.C. Halff310.42Sundry loans45,612.21$ 50,195.23Accrued Expenses: Interest and Other3,527.04Taxes payable (other than Federal Income Tax)6,622.14Federal Income Taxes (Reserve)34,303.8044,452.98Mortgages, notes, etc. payable: (Original maturity one year or more)On city land and building60,000.00Other21,842.3981,842.39Reserve for Tubes and Repairs10,041.93Capital Stock, Common500,000.00Earned Surplus226,938.40Total liabilities$913,470.93*49 The item of stock of Ratcliffe-Payne Motor Co. listed in assets above represented 52 percent of the stock of an automobile sales business in Corpus Christi, Texas, an outgrowth of the Wayne-Murray Co. in which petitioner owned all of the stock, and was in no way related to the radio broadcasting business in which petitioner is engaged. The item of bonds of Dittmar Properties listed in above assets represents 15 percent of the outstanding bonds of Dittmar Properties Co., of which corporation G.A.C. Halff owned about 35 percent of the stock and it was in no way related to the broadcasting business of petitioner. The item of Blanco Oil Co. listed under Loans Receivable in assets above was a corporation whose business was the purchase and development of oil properties, and its business was in no way related to the radio business in which petitioner corporation was engaged, and G.A.C. Halff, who was the only shareholder of petitioner corporation, also operated and owned all of the stock in the Blanco Oil Co.From March, 1934, through the taxable year ended July 31, 1940, petitioner made various loans to the Blanco Oil Co., a summary of the amounts of these loans outstanding at the end of *50 each fiscal year, together with the amount of interest accrued thereon, being as follows: Notes Receivable by Petitioner from Blanco Oil Co.PrincipalAccrued InterestCombinedAt July 31, 1934$353,800.00$ 11,085.73$364,885.73At July 31, 1935397,077.5033,803.70430,881.20At July 31, 1936417,363.0257,875.35475,238.37At July 31, 1937392,687.8275,111.89467,799.71At July 31, 1938364,200.0081,721.56445,921.56At July 31, 1939313,200.0092,059.29405,259.29At July 31, 1940377,200.00103,188.31480,388.31These loans were increased during the taxable year ended July 31, 1940, in the amount of $64,000 by the following transactions: DateNote No.Nature of TransactionLoansCollections8-10-3995Demand Loan$13,000.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Demand Loan15,000.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Demand Loan10,000.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Demand Loan17,000.0010- 2-3999Demand Loan1,000.0010- 9-39100Demand Loan8,000.0012-26-39NoneTemporary Loan5,000.0012-28-39NoneTemporary Loan11,500.001- 4-40NoneTemporary Loan Paid$ 5,000.001- 4-40NoneTemporary Loan Paid11,500.00Totals$80,500.00$16,500.00 During the fiscal year ended July 31, 1940, petitioner loaned $80,500 to the Blanco Oil Co. and received payments of $16,500, resulting in a net increase of $64,000 in the loan. Petitioner *51 used notes of the Oil Company in the amount of $65,988.64, including interest, in part payment of its dividend of $150,000 in 1938, all of which was paid to G.A.C. Halff. The Blanco Oil Co. had a net operating income of over $100,000 during each of the four years preceding 1940; in 1939 this income was $148,442.18. At the end of 1939 the Blanco Oil Company's books showed a deficit of $80,846.99 in earned surplus, and loans of $193,853.58 due others than petitioner. The loans to Blanco Oil Co. from others than petitioner were all secured by deed of trust and assignment of oil runs, as was customary in loans of this kind. The loans from petitioner to Blanco Oil Co. were all unsecured. The Blanco Oil Co., since its incorporation in 1932, has paid only one dividend to date of this trial, to wit, $20,000 in 1936. Most of Blanco's operating income has been invested in new oil properties, development or the repayment of loans. Petitioner's loans to it were paid off in 1943. As to New Transmitter Petitioner (hereinafter sometimes referred to as WOAI) has a 50 kilowatt broadcasting transmitter which is the most powerful type now permitted by the Federal Communications Commission for commercial *52 broadcasting, and is one of fifty of this type now in the United States, and WOAI is one of twenty-four radio stations which holds an A-1 clear channel license. There are approximately 900 standard radio broadcasting stations in the United States. WOAI installed this transmitter in 1930, when it was new and of the latest modern type, and it is still in use and in excellent condition, having been inspected five times from May 26, 1940, to December 22, 1944, by inspectors from the Federal Communications Commission, whose reports showed it to be in good or excellent condition upon each of these inspections. Such transmitters do not wear out under normal conditions, if properly used and maintained, and of nine 50 kilowatt transmitters of the same type as WOAI installed in the United States before 1931, seven are still in use, among these being WEAF, New York, WLW, Cincinnati, and other leading broadcasting stations. Although there are some moving or rotating parts, rubber hose, mica condensers, etc., which have to be replaced from time to time, such replacements are relatively simple. There are several features of transmitters of a later model than that of WOAI which are claimed by the *53 manufacturers to be improvements, and some of these features deal with ease of maintenance which appeals to the station engineers charged with that duty. Such changes could, if desired, be installed in the WOAI transmitter without a complete rebuilding of the transmitter, and at a cost appreciably less than the cost of a new transmitter. A radio expert, at petitioner's request, made a detailed inspection of the WOAI technical apparatus, and found all of same to be in good operating condition and rendering good service. There have been several technical developments since 1930 which have not been included in the WOAI transmitter. Up until February, 1942 (that being the date of the freeze order barring such purchases due to the war), new 50-KW transmitters could be purchased on the market and installed by radio stations. It is required by the rules of the Federal Communications Commission that radio stations must apply for permission in order to change their transmitters. No application for permission to change from its transmitter to a new 50-KW transmitter was made by WOAI at any time prior to the freeze order in 1942, or thereafter, and there was no evidence that petitioner at any *54 time attempted to purchase or secure a new 50-KW transmitter. The cost and installation of a new 50-KW transmitter in July, 1940, was approximately $100,000 to $125,000. Petitioner had theretofore made depreciation reserve of $152,299 on its transmitter which could have been used in buying and installing a new transmitter if it had desired to do so. Proposed Increase of Power to 500 Kilowatts Petitioner made application in 1936 to Federal Communications Commission for authority to increase its power from 50-KW to 500-KW, but the FCC took no action on this and similar applications made by other stations, and petitioner withdrew it in 1942. WOAI is located in an area where there is an unusual amount of static and such increased power would have substantially diminished static. The rules of the Federal Communications Commission have always restricted the maximum power permissible for standard broadcasting stations under ordinary license to 50-KW. However, prior to 1938, a few experimental licenses for broadcasting with higher power were granted to a few stations, but these were not permitted but a short time, and in June, 1938, the only station operating with power over 50-KW was WLW *55 at Cincinnati, and this experimental license expired in 1942, and application for renewal was denied by FCC, and there are now no stations in the United States operating transmitters with a power in excess of 50-KW. In June, 1938, extensive hearings were held by the FCC dealing with revision of its rules, and the matter of the 50-KW limitation of power was considered, and while such hearings were being held, the United States Senate adopted Senate Resolution 294, in condemnation of broadcasting stations having a power in excess of 50-KW, since it served to concentrate political, social and economic power and influence, and further, that it was injurious to other stations operating with less power and tended to foster monopoly on the radio industry. The Federal Communications Commission stated, in a report of June 30, 1939, that the licensing of stations with power in excess of 50-KW was not contemplated and the limitation of power to 50-KW was incorporated in its rules effective on and after June 25, 1940. These rules were released and made public January 15, 1940, and it was shown that the officers of petitioner kept well advised at all times regarding the rules and regulations of *56 the FCC, as reflected in its public reports. The cost of the necessary equipment and installation required to increase WOAI's power to 500-KW was approximately $250,000. Frequency Modulation About 1936, there was discovered a new method of radio broadcasting called frequency modulation (hereinafter referred to as F.M.), as contra-distinguished from standard broadcasting. F.M. involves the use of a great deal higher frequency cycle of the radio band than is used by the standard broadcasting band now available to standard broadcasting stations. It transmits for a less distance than the standard broadcasting, but transmits, it is claimed, with greater clarity and less interference from other stations. For several years after its invention, there were only a few experimental F.M. stations, and in June, 1940, FCC first placed it on a commercial basis and issued regulations governing it. Its acceptance by the industry has been rather slow, and in June, 1945, the total number of F.M. radio stations in the United States was fifty, as compared with eight hundred standard stations. Standard receiving sets throughout the country will not record F.M. broadcasts and a different type of receiver *57 is required to record F.M. broadcasts, there being about 300,000 F.M. receiving sets in the United States as compared with sixty million standard receiving sets. The F.M. receiving sets cost $75. The records of the FCC show that the stations operating F.M. for the most part are operating with powers below 5-KW, and none were operating with as much as 50-KW, but there were six stations using power near 50-KW. WOAI, before acquiring the 50-KW transmitter in 1930, was using a 5-KW transmitter, which it still has and is in good condition and is sometimes used as an auxiliary to its 50-KW transmitter. Up to July 31, 1940, petitioner had not filed an application with the FCC for an F.M. license. Such an application was filed by it in January, 1944. At that time the freeze orders were in effect, and it was known that such an application would not be acted upon until materials were available, and applicants were advised by FCC that no action would be taken on such applications until the freeze orders were lifted at the termination of the war. Petitioner claimed that it has a deposit with the Western Electric Co. for the purchase of a frequency modulation equipment as soon as its application *58 is approved. There were no F.M. radio stations in Texas in 1940, or none up to the date of this trial in June, 1945, but in 1945, there were nineteen applications for F.M. licenses in Texas, two others besides petitioner from stations located in San Antonio. The equipment and installation of an F.M. station at WOAI would be approximately $150,000, if the present site of WOAI is used, but on a new site on higher ground, which would permit a higher antenna and maximum coverage, the cost would be approximately $175,000 to $200,000. But F.M. could be used at the present site of WOAI by using the antenna of the present transmitter as a support for extension of the F.M. antenna. Television Television by radio has been slow in development and use, and was not permitted on a commercial basis by Federal Communications Commission until after April, 1941, and there are only three such stations in the United States, New York, Schenectady and Philadelphia, and they are not operating upon a self-sustaining or profitable basis. Television broadcasting is extremely costly and complicated and many problems yet remain to be solved, and there is no reasonable expectation that its use will be general *59 in the near future. Petitioner has never filed application with the FCC for television broadcasting and there is no documentary evidence in the records of petitioner that show any intention to go into the field of television broadcasting, and no oral testimony of its officers that any effort had been made to secure same. Facsimile Reproduction Facsimile reproduction transmission has not been adopted by broadcasting commercial stations in any part of the United States, and there was no evidence that petitioner had attempted or contemplated its introduction in its broadcasting station. It is not necessary under the rules of the FCC for a licensee of a standard broadcast station, in order to keep its license or have it renewed that it apply for an F.M. license or television license; a standard broadcast station can fulfill all rules and regulations of the FCC for keeping its license without going into F.M. or television. No regulations of the FCC make any requirements as to the amount of surplus funds a broadcasting station must have. Not over half a dozen standard broadcast stations have been deprived of their licenses for any cause from 1940 to date. During the year 1940, G.A.C. Halff, *60 as an individual, was assessed and paid a surtax of $6,506.49, and if all of the net earnings of petitioner corporation for 1940 had been distributed instead of carrying $86,926.46 to surplus, G.A.C. Halff, as an individual, would have been due an additional surtax of $43,476.22. Petitioner's earnings and profits were permitted to accumulate beyond the reasonable needs of its business for the fiscal year ended July 31, 1940, and petitioner was availed of to prevent the imposition of the surtax upon its shareholder. Opinion The question here presented is whether petitioner corporation for the fiscal year ended July 31, 1940, was availed of for the purpose of preventing the imposition of the surtax upon its sole shareholder, G.A.C. Halff, through the medium of permitting earnings or profits to accumulate instead of being divided or distributed, as contemplated in section 102 (a) of the Internal Revenue Code . Section 102 (c) provides that if the earnings or profits of a corporation are permitted to accumulate beyond the reasonable needs of the business, it shall be determinative of the purpose to avoid surtax upon the shareholders, unless the corporation, by the clear preponderance of *61 the evidence, shall prove to the contrary. Respondent having found that petitioner's accumulation of earnings for the taxable year in question fell under section 102 (a), the burden is upon petitioner to disprove the facts leading to such a determination, Trico Products Corp., 46 B.T.A. 346; aff'd. (C.C.A., 2nd Cir.), 137 Fed. (2d) 424; certiorari denied, 320 U.S. 799; rehearing denied, 321 U.S. 801. The evidence in this case, both oral and documentary, is quite voluminous, and all of same has been given due and careful consideration. Many cases of this character have been decided by this Court and appellate courts, and cases cited in the briefs of the parties and many others have been examined, but since the facts differ in each, their chief value has been to define the limits to which the courts have gone in applying the statute and in measuring and passing upon the sufficiency of the evidence. Petitioner admits, as it must, that during the taxable year ended July 31, 1940, its net earnings or profits were $161,925.46, of which only $75,000 was paid as a dividend to G.A.C. Halff, its sole shareholder, but contends that the failure to pay out the remaining $86,925.46 was warranted *62 by the reasonable needs of its business. The $86,925.46 was carried to surplus. The question of what is the reasonable needs of a taxpayer's business is one of fact to be judicially determined upon all of the facts and circumstances in each particular case. Trico Products Corp., supra, and cases there cited. "What would be reasonable in one situation or for one business might be clearly unreasonable in another." William C. de Mille Production, Inc., 30 B.T.A. 826. In determining whether the taxpayer for a certain year accumulated profits beyond the reasonable needs of its business, we must consider not only the undistributed earnings or profits for that year, but the surplus, if any, already accumulated, the assets of the company and their liquidity, the expenditures necessary to be made to meet its financial obligations and to carry on its successful operation. Let us consider the salient facts of the instant case as concerns the reasonable needs of petitioner's business for the taxable year in question, first considering its financial ability to buy new equipment or expand its business if it deemed necessary so to do. Petitioner was engaged exclusively, and had been since 1933, *63 in operating a radio broadcasting station, known as WOAI, in San Antonio, Texas. Its business has been successful and very profitable. It started with a capital of $25,000 in 1911, and on July 31, 1940, its books show a total capital and surplus of $726,938.40, of which $180,576.93 had been paid in, $12,993.54 net premiums received on sale of stock, and the remainder, $533,367.93 of its total capital and surplus had been earned by profits and stock dividends from its business. Its policy had been to materially increase its surplus each year, and its surplus had grown from $21,820 in 1934 (the year G.A.C. Halff became its sole owner), to $226,938.40 on July 31, 1940, the taxable year involved. Its surplus and a substantial part of its capital has been used largely for investment in other enterprises in which G.A.C. Halff was the principal owner. Counsel for petitioner seeks to justify the necessity for petitioner's large and constantly growing surplus in his brief, from which we quote: * * * We believe that it will be conceded that any business needs reserves both against known necessities and against unknown necessities. For example, a bank might have had more deposits than withdrawals *64 steadily over a period of years; yet it would be very foolish if it assumed that that course would continue and accordingly keeps no cash or liquid assets to meet withdrawals and builds up no surplus to take care of losses. * * * And follows this with a statement that banking regulations require that large portions of their assets be retained uninvested, and that history has shown that those banks which merely kept the "legal reserve" were often casualties in a depression. The nature of petitioner's business is radically different from that of a bank. There is no law or regulation requiring a radio broadcasting station to maintain a surplus in any amount. Furthermore, petitioner, unlike a bank, has no depositors and there could be no "withdrawals" as it operates wholly on its own capital and its sole legitimate business is the sale of the services of its broadcasting facilities, and it merely sells and collects for same. The evidence in this case shows that petitioner is practically on a cash basis, so far as its income and expenses are concerned, since it collects monthly from its advertisers and radio net-works, and pays its current expenses monthly. It is obvious that petitioner *65 can make no claim for a need of a large surplus or even a large working capital when it is noted that $408,378.12 was received in monthly collections in fiscal 1940 for broadcasting services, and $11,340 as rents, and petitioner's total expenses and deductions for the year were only $239,752.30, including $10,595.77 allowed as depreciation. When petitioner carried $86,925.46 of its earnings for the taxable year (1940) to surplus, it then had a surplus theretofore acquired of $145,847.22, and in addition assets (much of same liquid) many times that amount. Its current liabilities amounted to only $96,648 as against current assets of $758,827 (surplus not included), making the ratio of its current assets over its current liabilities of about eight to one. The major portion of petitioner's assets had no relation whatever to the business in which it was engaged, and this is significant, not only in determining the reasonable needs of the business, but also in passing upon the motive of petitioner as to whether the accumulation of profits was to evade the imposition of a surtax. The total assets of petitioner on July 31, 1940, as shown by its books, was $913,470.93, of which only $153,293.33 *66 was fixed assets relating to its broadcasting business. In this item of fixed assets were the plant, physical properties, fixtures, studio, machinery, broadcasting equipment, etc., and the figure given was the net value of fixed assets after deducting a reserve for depreciation of $250,277. Among the remaining assets not directly connected with or related to the radio broadcasting business were these: Loans Receivable: Blanco Oil Company$377,200.00G.A.C. Halff13,356.26Others16,651.73$407,207.99Accrued Interest Receiv-able: Blanco Oil Company103,188.31Others16,289.92119,478.23Stocks and Bonds: Stocks of Ratcliffe-Payne Motor Co.22,100.00Bonds of Dittmar Prop-erties41,000.00Central P. & L. Corp.6% Pfd. Stock960.00Others1,810.00Street Widening Cer-tificates3,654.0069,524.00Cash118,550.82Total (Non-operating Capital)$714,761.04 If the reasonable needs of petitioner's business had required an expenditure for new equipment, expansion or installation of additional facilities, no reason was shown why, in addition to the $145,000 surplus theretofore acquired, all or a substantial part of its large non-operating assets could not have been used for this purpose. In seeking to justify the large *67 accumulation of surplus and non-operating capital, petitioner offered evidence covering a wide range of needs that its business might require, most of them being mere possibilities for which expenditures might have to be made in the future, some, if at all, in the remote future. There was evidence that a more imposing building might be desirable, but there was nothing in the record to even suggest that any plans or decision, tentative or otherwise, had been made to erect same. Forty-five thousand dollars had been spent in the summer of 1938 on a new studio in its present building. G.A.C. Halff testified that in 1933, when he changed the name of petitioner corporation to Southland Industries, Inc., the word "Industries" was used, and he retained in its charter the authority to buy and sell goods, because he "thought at a propitious time" he would "re-enter into the merchandising business of some nature" and that during the seven intervening years he made several unsuccessful efforts to buy an established business, but mentioned only two instances, first, an offer to buy a department store in Corpus Christi, which was not accepted, and the other that he "expressed a willingness to buy" *68 a large department store in San Antonio, but it is not shown that he ever made a definite offer or that any negotiations resulted. In any event, expected investment in a merchandise enterprise has no bearing on the needs of the broadcasting business in which petitioner was engaged. Instead of buying a merchandising business, he had evidently found it more profitable to invest or loan the profits from his radio business to his Blanco Oil Co. and to invest in stocks and bonds of the Ratcliffe-Payne Motor Co. and the Dittmar Properties, in which last two corporations he was also largely interested. As to alleged needs of petitioner's radio business, its principal piece of equipment is a 50 kilowatt transmitter which was installed in 1930 and has been maintained in good operating condition. It is of the largest type licensed for commercial use by the Federal Communications Commission. Petitioner contends that in 1940 this transmitter was becoming obsolete and also that large reserves of funds were required to take advantage of "sweeping inventions and advancements in the art" of broadcasting by radio. More specifically it stresses its application made in 1936 to increase its power from *69 50 to 500-KW, frequency modulation, television and facsimile reproduction. If the evidence adduced tended to establish the necessity for these innovations to enable petitioner to meet competition and maintain its predominant position in the area served by its station, the argument advanced would be persuasive of its needs therefor. But after considering the evidence, we are not convinced of such necessity or of a belief in it by petitioner's sole shareholder. Prior to the taxable year and in June, 1938, the United States Senate had declared the operation of broadcasting stations with power in excess of 50 kilowatts to be against the public interest, and in June, 1939, the Federal Communications Commission publicly announced that none with greater power would be licensed. Petitioner therefore had no reasonable expectation in 1940 of needing or even being permitted to own a more powerful transmitter than the one that it already possessed. Frequency modulation was merely in the experimental stage until June, 1940; its commercial use is still limited, and as petitioner first made application for a license to install frequency modulation in 1944. Halff can not colorably claim to have believed *70 it a necessity in 1940. Petitioner has never applied for a license to broadcast by television or facsimile transmission, and the record rebuts rather than establishes that such types of transmission were a likely need of petitioner's business in 1940 or at present. While there is credible evidence that certain parts of the transmitter, such as tubes, filaments, frequency and amplitude characteristics, were inferior to more modern types, the $125,000 estimated cost of a complete renovation of the transmitting apparatus in 1940 was materially less than the accumulated surplus of $226,938.40. It is even more damaging to petitioner's contention that the record fails to disclose a subsequent replacement even of the parts deemed outmoded. To justify the accumulation of surplus so as to render imposition of the surtax improper, it is not enough that new inventions might eventually require new equipment, for the statute contemplates the immediate needs of a business, not the possibility of necessary expenditures in the indefinite future. McCutchin Drilling Co. v. Commissioner (C.C.A., 5th Cir.), 143 Fed. (2d) 480. Since the undisputed evidence shows that neither television nor facsimile *71 reproduction was or could have been considered a reasonable need of petitioner's business in 1940, petitioner then had in its surplus theretofore acquired, combined with non-operating assets, adequate funds, as heretofore pointed out, to purchase all of the other alleged needs of its radio business. We therefore hold that petitioner, in 1940, did accumulate earnings and profits beyond the reasonable needs of its business. We further hold under all the evidence that its purpose in so doing was to prevent the imposition of the surtax upon its sole shareholder, G.A.C. Halff. Under the statute, the burden of proof was upon the petitioner to show by the clear preponderance of the evidence that such was not its intention, and this it has failed to do. In the Treasury regulations, among other circumstances which might be construed as evidence of the purpose to avoid the surtax, are these: * * * (1) Dealings between the corporation and its shareholders, such as withdrawals by the shareholders as personal loans or the expenditure of funds by the corporation for the personal benefit shareholders, and (2) the investment by the corporation of undistributed earnings in assets having no reasonable *72 connection with the business. The mere fact that the corporation distributed a large portion of its earnings for the year in question does not necessarily prove that earnings were not permitted to accumulate beyond reasonable needs or that the corporation was not formed or availed of to avoid surtax upon shareholders. [Regulations 103 (1940), section 19.102-2]. Circumstances mentioned in (1) and (2) above are both clearly shown in the instant case. G.A.C. Halff, the sole owner of the petitioner, was likewise the sole owner of the Blanco Oil Co. These corporations, like that involved in Chicago Stock Yards Co. (1940), 41 B.T.A. 590, 621; affd. (1943), 318 U.S. 693, were the alter egos of Halff, or Halff in corporate clothes; he was the controller and the proprietor of the entire enterprises. The petitioner corporation, for want of any use for its earnings, had been plowing a large part of them into Blanco's operations by way of loans. Of its total assets of $913,470.93, over half, or $480,388.31, represented loans and interest owed to petitioner by the Blanco Oil Co.During the taxable year in question, the loans to Blanco were increased by $64,000, which could have been paid to *73 Halff as a dividend. As the court remarked in the similar case of United Business Corporation of America v. Commissioner (C.C.A., 2nd Cir.), 62 Fed. (2d) 754; certiorari denied, 290 U.S. 635: * * * These loans are incompatible with a purpose to strengthen the financial position of the petitioner, but entirely accord with a desire to get the equivalent of his dividends under another guise. * * * Halff, by means of loans, used petitioner's earnings and profits in the development and expansion of the oil business as he might have used them if distributed to him as dividends. Since he was the sole owner of petitioner's shares, however, its "business would have been as well protected against unexpected demands for capital" through his receipt of the earnings as it was by notes of the Blanco Oil Co.This case seems indistinguishable from Helvering v. National Grocery Co., 304 U.S. 282; Medical Arts Hospital of Dallas v. Commissioner (C.C.A., 5th Cir.), 141 Fed. (2d) 404; Wilkerson Daily Corp. v. Commissioner (C.C.A., 9th Cir.), 125 Fed. (2d) 998; and J. M. Perry & Co., Inc. v. Commissioner (C.C.A., 9th Cir.), 120 Fed. (2d) 123, and we accordingly hold that petitioner was availed of *74 during the taxable year for the purpose of preventing the imposition of the surtax upon its shareholder through the medium of permitting its earnings or profits to accumulate. Decision will be entered for the respondent. Footnotesa. As agreed to for years prior to the taxable year ending July 31, 1940, and not contested for that year. ↩c. Additional Federal income and excess profits taxes for the years ended July 31, 1941, and July 31, 1942, are in controversy. ↩d. No Revenue Agents Reports yet issued; figures are per books or tax returns. (Section 102↩ surtaxes are being asserted for petitioner's fiscal years 1941 and 1942: and petitioner has claims for relief under section 722 pending for those years.)b. Adjusted by Revenue Agents Reports to $738,312.41 before section 102↩ surtax, and adjustments not contested.